United States v. Tadevosyan. And Mr. Craig starts. Please, Mr. Court, I'm Courtney Craig on behalf of the defendant Sargis Tadevosyan. I'd say if there was a theme in this case, it's that conspiracy requires agreement. Agreement requires knowledge, and that knowledge provides the basis for intent. And in direct sales company v. the United States, the court said that that intent, evidence of that intent must be clear. It can't be equivocal, and it can't be made by piling inference upon inference. And as we look at the review of this case, you take all the evidence, both direct and circumstantial and the like, most favorable to the government to show that they have in fact proven the essential elements of this case. Now, in the health care case, the health care fraud case, we know that there was a scheme to defraud the health care program. That was done by the head of this, which was a man named Garrick. And Garrick operated in a way that he kept the left brain or the right hand from knowing what the left hand was doing. Because if you look at what the two co-defendants said, they were never told that health care was in any way involved in this and what their plans were. They were told first that they were to open up bank accounts for people who'd left the country. And they didn't think that was illegal, and then they thought after that and said, well, maybe it is illegal. Then they were told that they were accounts for Internet companies. And then they were told a third thing, and I can't recall exactly what that is, but when one of the co-defendants got to the bank, he told the bank manager that they were accounts for restaurant companies. They were never told anything about health care fraud. And even if you look at the false front providers that they went to, their names carried no indicia of health care. There was nothing taken from those things that in any way indicated health care. So in order to find that my client engaged in a conspiracy to commit health care fraud, we have to find that there's a common scheme or plan to defraud that, which I would suggest there is, but that he agreed to become a member of that conspiracy. What if Person A and Person B are aware of a broader range of conduct that is clearly going to violate the law in the health care area? And Persons C and Person D are hired to do some illegal stuff, but they don't know what it's for. They have to carry a gun, and they have to be bodyguards and protect the activity. They know that the other two are up to no good, but they don't know what the object is. C and D are still members of the conspiracy, right? I don't believe so, but not in this case, because both wire fraud and health care fraud require specific intent to defraud that. If they don't know what the object of the conspiracy is, then I think it's almost impossible for them to agree from the beginning to make this come about. They know that they're hired for what may be an illegal purpose, but merely being guilty of an illegal act without further context or knowledge of what the higher plan is, I don't think that you can – well, I know you can impart that knowledge to the person. What about the Supreme Court's case in Fiola where it pointed out that you only have to be aware of an unlawful object? Well, it has to be of an unlawful object, but I still would suggest that, again, in the context of specific intent, which these two crimes require, that he would have to be at least aware of the general law, like generally I'm violating a health care law, or generally I'm violating a wire fraud statute, which is not the case. And, you know, when we look at this, the government's original retort to that he had enough knowledge regarding the health care fraud is that he was seen talking on the telephone playing with some keys. Now, those keys were never identified in the record as the actual keys that were used to the false front providers, but even then there's no context given on what the conversation was at the other end, nor were we told – I thought there was evidence that the keys opened those front – There was a set – that a set of keys did open, but they weren't specifically those keys identified. So I'll suggest even if he's talking on a phone, we don't know who he's talking to, and you have to assume by piling inference on that that was what the conversation was about when we don't know, and the government had an opportunity to elicit that information from the witness that they called and failed to do that. Well, you do – there is rarely going to be direct evidence of the defendant's state of mind or state of knowledge with respect to a conspiracy, so you have to – it has to be proven by circumstantial evidence, does it not? Well, I understand, but that's where I think you get into piling the inference upon inference. They can't be equivocal, and when I looked up Webster's definition of equivocal, it means that it's not subject – it's subject to several interpretations. I mean, that call could have been to anybody. I know that I play with my hands when I'm on the phone. But there was sufficient evidence from which it could be reasonably inferred that there was an awareness of the illegal nature of the conspiracy, surely? Well, I believe that there may have been evidence that my client knew that perhaps there was fake identification, but he wasn't charged with a fake identification. He was charged with aggravating and betting aggravated identity theft, which requires that you prove that the identity actually belonged to somebody, which is what the difference is between those crimes. You're having to take somebody else's identity in a real person. I think if he was charged with fake identity, I think you'd have more than enough evidence to convict him. But to extrapolate from the fact that he gave them fake identity, to extrapolate to the fact that he knew the essential objects of the conspiracy, I think, is the kind of inference that direct sales prohibits. Did he know that the person whose identity was being used had left the country? No, he did not. They never showed that. They brought a letter in from the Social Security Administration to say that that had been – I don't understand, but I thought there was some suggestion that he handed this identity – Garrick handed him the identity stuff, or he carried the identity and handed it to the – It was in the car that he borrowed from the government. There were two stories on that, whether it was in the car or whether it was given it to him. You know, Klim Baikoff being a real person, at one time, Garrick, the mastermind, identified himself as Klim Baikoff. At another time, Igor Shevchuk walks into the bank and says he's Klim Baikoff. And even the government, on page 56 in its brief, talks about Igor Shevchuk being Klim Baikoff. I mean, if you're going to admit that he's that, all you've admitted is that they're good at getting false identities and misleading people. As far as the jury instruction goes, it only said that he knew that he was acting wrongly. And, again, these are specific intent crimes, and I think that you have to – you have to show that he knew that he was at least violating the general law that prohibited that. And there's no evidence on that. And N. Ray Winship says that the presumption remains constant, and any instruction that lowers the jury's burden of proving all the essential elements violates that – to be on notice of the essential elements. And I don't think that you can get there based on those two. And I will reserve the rest of our argument for rebuttal. All right. I understand we're going to hear from Mr. Mervis next. Good morning, Your Honors. My name is Tony Mervis. I represented Sergeant Tedrosian on his trial. May it please the Court, I'm going to address the Court with regards to several other issues. Specifically, post-conviction, there was something uncovered, the fact that Igor Shevchuk's actual name was Ildar Adjugulov. And I would submit to the Court that the government – Shevchuk was a cooperator. The government, when they work out a cooperation agreement, they interview the person, they meet with them, they confirm that they're telling the truth, and the government either knew that Shevchuk wasn't his real name or they should have known. That's something that should have been investigated. What is the nature of your claim? I mean, what's the nature of your argument? I understood you to be characterizing it as Brady, and I don't see how it fits as Brady. What harm did that cause? I mean, what is your legal challenge? Had we known that his real name was Adjugulov and that he entered into the country under a different name, we would have been able to further investigate additional stuff that he may have done. But think about what you're telling me. You're saying that the government should have investigated, but that doesn't seem to be Brady. Nothing you have articulated is Brady. Brady is failure to disclose material information. My question is, I understood the record. You made the government aware of the fact that the name was incorrect or the identity may have been correct. So you knew it. So it can't be Brady. I mean, I'm having trouble understanding what you're arguing. We only found out later. We only found out and we notified the government right away. Right, but you knew. So the government wasn't concealing something, could not have been concealing something from you. Do you have any evidence that the government knew before you told them? Yes, the government, once we advised them, when the government responded at the sentencing hearing, the government responded that the interpreter interpreted the name and they found the name and they heard it in the transcripts. So it was there. That's something that... No, the question was, was there evidence that they knew before? Before we notified them? Yes, I understood that to be the question. They did have information that his name was Ildar, that he was called Ildar. But where's... What does that do for you? You've got a stream here, and I gather this is your argument, is that the government knew this guy's right name. He was using a false name. If you had been given the right name, you could have investigated and found out whether he committed other crimes and you could have used the other crimes for impeachment. Yes. Pretty long string, isn't it? And even if we follow, I mean, let's give you the stream. It still doesn't help because Brady doesn't apply. Brady only applies to material evidence and is not evidence that the use of which is purely impeachment. Well, it's not just impeachment. It's something that is critically important in the entire case. It's something that's necessary. How? Well, if he entered into the country under a false identity, and this is not the first time that he's committing this act of aggravated identity theft, whether it be charged or not charged, it's not merely impeaching. Then what is it if it's not impeaching? Well, it's evidence. It's evidence to impeach his credibility as a witness, right? How else would it be used? But it's not solely for that. And what else would it be used for? It would be used to determine whether he had committed other similar acts. It's not simply to show that his role in this case was different other than what the government has alleged or what he has testified to. Well, whatever this evidence is, why should we even consider it at this stage, given that you didn't seek any relief, whether it be Brady, whatever it is, in front of the district court? We really don't have anything to review at this stage. Well, we did bring it up at the sentencing hearing. The judge basically had us go forward. Didn't she tell you to file a motion for a new trial? The judge did say to file a motion. No, we did not. So what are we left with? We're left with us bringing it up in the sentencing going forward.  Why didn't you file a motion? If you think it's good enough to raise here, why didn't you raise it there? Well, we felt that we were under the time constraints to file within the 14 days to file a notice of appeal, which in my understanding would divest the district court of its jurisdiction. So we brought it up over here on the appeal. Also, while I still have a little bit of time, I wanted to discuss whether or not the defendant would be eligible for the minimal role reduction. Specifically in terms of the minimal role reduction, his involvement started on May 5th or May 6th. That's when all of the health care had already been billed previously. There were agents that testified that the only time that they've ever seen him or heard his name, and this was both before the investigation and after the arrest, his name is only related to this one date of May 6th when he got involved. Basically, everything was already done. The other defendants that are involved, they were involved much more than him. He was a much smaller player. He could have been interchangeable with anybody that could have delivered somebody. I don't want to say that he was similar to a car service driver, but in essence his job was to deliver the other two people there. Fake IDs? Yes. The district court found that his role was essential to the success of the venture. Yes, and that's where we're actually appealing. We don't agree that he was essential to the role because in essence he was a driver. He did not go into the banks. All he did was he delivered. He sent in the two guys to go into the bank and dropped them off. He was going to pick them up and was sort of controlling the operation. Well, actually it was Garrick who was telling them. Well, of course. He was responding to Garrick. But Garrick was controlling the defendant here, and the defendant here was carrying out the operation, coming from New York to West Virginia, driving them and giving them the IDs and telling them what to do when the police stopped them. The traffic stop, you remember? Sure. In terms of that, the government alleged that he told Bedjanyan what to tell the officer in Maryland. He was just interpreting what Sargis was saying. Didn't he tell them how to hide and conceal the documentation? Yes. A driver doesn't do that. Somebody who's responsible for the effort does that type of instruction. I agree. Thank you. Okay. Thank you, Mr. Mervis. All right. Now we have Ms. Thomas. Is that your turn? Yes, Your Honor. I'm Meredith George Thomas. I'm Assistant United States Attorney in Charleston, West Virginia, and the judgment of the District Court before the Honorable Judge Copenhaver should be affirmed. Do you understand the nature of the alternate identity argument? What is it exactly? In regards to the Ildor situation, Mr. Smith, before the District Court, explained exactly what happened and how we became aware of this, and I can go through it. No, I'm just not. It just isn't clear to me what the legal challenge is. I don't understand what the legal challenge is. We don't think it's Brady, and the defendant didn't file a motion for a new trial, so I agree with that. I was just trying to clarify. That is false within the Brady document. Yes, but the United States would have to have it in order for it to be a violation of Brady. It would have to be material. I believe so. I mean, we would have turned it over anyway if we had had it. Do you have open file? Just curious. I don't. I wouldn't call it that. No, I mean, it's beyond the record, and I apologize for asking. However, there was substantial evidence that the defendant was guilty to commit conspiracy. Why don't you give us just a recitation again of the conspiracy evidence. That seems to be the position that the defendant here is pressing the hardest. Well, I'll start with the conspiracy to commit health care fraud, and then I'll move to the conspiracy to commit wire fraud. Admittedly, the health care fraud prong of the conspiracy is not as strong as the wire fraud prong. However, there is substantial evidence showing that the defendant was aware of the object of the conspiracy. Here, the evidence about context is extremely important. It's a major scheme to defraud Medicare using banks and wiring funds. Garrick is shown through the evidence presented to the jury as a leader in this investigation, but Tativosian is his right-hand man, essentially. So you have to think of all the evidence together. There are photographs in the car of the defendant and Garrick, and as the defendant pointed out in that Second Circuit case, Amorone,  It's not enough to prove a conspiracy, but it certainly shows an association which can be evidence of an agreement. Furthermore, the defendant had the keys, and he was talking on phone while going through some keys. Mr. Bedanyan testified that he saw them being placed into the driver's side door, and those keys were found by Trooper LaFouch when he searched the driver's side door of the car. Those keys were labeled with the names of the false front providers, and they fit into the doors of the false front providers. Now, Garrick sent the defendant to West Virginia, so it's a reasonable inference that he gave him the keys. The defendant also told Mr. Bedanyan, when they were down at the bank, that they needed to go pick up mail at a couple of places. So a reasonable inference is they had to pick up mail at the false front provider, and if you look at the photographs, which are in the record, they showed mail had certainly stacked up there. If you look at page 1448 of the Joint Appendix, the mail to pick up included mail from Medicare and its contractor, Palmetto. So this circumstantial evidence shows evidence of the healthcare fraud conspiracy. Moving to wire fraud... Did he actually pick up mail, or was he arrested before? He was arrested before. As for the conspiracy to commit wire fraud, the United States showed there was more than substantial evidence, as the jury found to support the jury's verdict. Under the aggravated identity theft, does the defendant have to know that the identity is of a real person, or does it just have to be a fact that has to be proved? The defendant has to know it's a Supreme Court case, Flores v. Uroa, that it is a real person. And the defendant actually did not raise that issue in his Rule 29 argument. We would argue that he waived that. He raised the issue that Clem Baikoff was a real person, and the government didn't prove that. However, the government proved substantial evidence that he was a real person, an actual person. They provided this... Was Clem a he, or a she? Clem, I believe it's a him. I understood the defendant's argument to be that he could not be guilty of conspiracy because the students, the two students that were part of this scheme, didn't fully understand the object of the conspiracy. Is that the law? I don't think that's the law at all. A conspirator doesn't have to know all of the details of a plan. Now, he... And I know that Judge Neimeyer spoke about Viola. I, unfortunately, am not familiar with that case. But here we would argue that Tadevosian was certainly familiar with the objects of the conspiracy. Well, apparently, there was enough evidence to show a relationship between him and Garrett. Right, which is another agreement. So it could be that... You don't need another agreement. That is part of the conspiracy. That is the conspiracy. Right. So it's not limited to a conspiracy between the named defendants. But he did have an agreement with the two persons which was basically he reached arrangements as to how to drop them off, pick them up, what they were supposed to do, handed them the identity, and they participated in that. And that's a lower-level agreement, but that's a participation in this illegal scheme. Absolutely. They may not have known fully, although they knew they were going to give false identities. It's pretty clear they knew that. But the larger fraud with respect to Medicare and Medicaid depends a little bit on the storefronts and the mail and the keys and so forth. That's correct. And there was part of the agreement was between Garrett and the defendant, certainly. Is Garrett the head of the conspiracy? Or is it larger than that yet? That's not in the record, Your Honor. In regard to the wire fraud, it's common knowledge the banks wire money. Here it's obvious from the circumstances that this is a large fraud. The money is not going to stay in West Virginia. So the defendant is driving individuals from Brooklyn. How much money was involved in this particular health care fraud? Overall, approximately $4.2 million. The district court found that only $491,000 was attributable to the defendant. However, as you move here, the defendant was going to and from New York, and additionally he tells the defendant, he tells Bitsanian to blame it all on Garrett because he's going to be out of the country. This implies that a wire is going to be used. It's reasonably foreseeable that there is going to be a wire used in this situation. There's also more evidence than that suggesting a conspiracy to commit wire fraud, if the court would like to hear it. Certainly, he set up the ride to go back to West Virginia. He made sure that the defendants, I'm sorry, he made sure that Bitsanian and Shevchuk knew where they were going and why they were going there. He had the false identification. The court's well aware of that. Furthermore, in regard to the defendant's argument about minimal role adjustment, the court did not err in sentencing the defendant. He was material and essential. Does it matter that someone else could have stepped into that role? No, because he did it. He is the one who did it, and he was not just a driver. The defendant has argued multiple times that he was just a driver here. He was much more than that. He had the keys in the car to the false print providers. And Bitsanian and Shevchuk didn't want to go back to West Virginia. He's the one that was sent to make sure they actually did it. And their meeting at the bank was extremely important. That account had no online access as the United Bank vice president testified at trial. Did the vice president know of the investigation when he came back and changed the account? Yes, Your Honor. The government had alerted him to it? Yes, Your Honor. The bank was under surveillance at the time of the meeting. But the access that would have been provided at this meeting would allow money to be transferred in and out of the account on the same day and the KB Support, which was the company that had billed Medicare, they'd only billed them a few days before the meeting. They expected payment. Usually it happens in about 14 days after Medicare's billed, and so they were expecting money. The scheme was expecting money to come in soon, and therefore the defendant's role was to make sure this meeting happened so the money could get out of the account. Anything else? No, Your Honor. All right, thank you. Let's see, Mr. Craig is going to do the rebuttal. Again, when I hear the government assess the evidence, you look at it that he must have gotten the keys from Garrett. The car was borrowed. Where did the keys come from? It's somewhere in the car. If it didn't come from Garrett, he's even a higher-up. Well, what I'm saying, I believe that they could have been left in the car. I mean, there's another reasonable alternative. It's his car, isn't it, from California License Plates? It was not his car. It belonged to someone else. My client was asked to drive them. Well, why did he have the keys? Why did he put them back in there? Well, that's what I was trying to tell you earlier. I mean, I fidget a lot when I talk on the phone. I mean, I can't tell you. We don't have a record from that, and that you have to infer something that's not in the record. But juries can, at this standard, the standard on sufficiency is the government gets the benefit of all reasonable inferences. But, again, you have to pile on that Garrett told him that he knew what was going on at the bank when even Bedsanyan says we had to sign papers at the bank. There's no evidence that he knew what the objects were, and the only reason I bring up that is... What are you doing with the identities and handing them to false identities and telling them to hide the identities when he was stopped? And, again, I can explain that. If he were charged with fake identification, transferring fake identification, I think that would be true, but you've got to jump... No, it's part of the Medicare fraud. The Medicare fraud involved using the banks and getting the payments in the banks, and this was a necessary step to carry... It wasn't necessary. It was a step they set out to do, which is to get electronic withdrawal from the bank account, and so they send down this man with the identities. He's got to know that, and he's directing him what to do. He's going to pick up mail. Now, where is he going to pick up mail? Well, first of all, that he had to pick up mail, it didn't say. I mean, we don't know. Again, you have to assume, and that's an inference that's not drawn from any evidence there, and, again, that's what direct sales talks about, piling inferences upon inferences. And, again, Mearson... He was not a West Virginian, was he? The only contact he had from West Virginia was the keys to these front... Well, he was asked to drive them down there, and even the first time, there was no evidence that they knew anything about health care or about wire fraud. Well, what's he talking about when he says he has to go pick up mail? I don't know, and that was never... Nobody ever deduced that. They had the opportunity to ask... Well, I can tell you why based on the circumstantial evidence and what the jury found. Well, I think... They said he's going to pick up mail at the only places he has contacts in West Virginia, which are those storefronts, because he has the keys labeled for those storefronts. And, again... And mail in the storefront. And, again, Your Honor, I would suggest that that is piling inference upon inference to get to a situation. There's a reason... It's circumstantial. It's circumstantial. There's a reason that they chose to pick conspiracy and chose a dual-object conspiracy. And, clearly, the instruction that was given by the district court lowered the level regarding specific intent with both, and if we go to Yates versus the United States, that says that where there's ambiguity as to which prong of the conspiracy statute or the dual-object that he was convicted under, if there's been a lowering of the standards for proving that, then you should throw out both. And, in fact, the exact quote from Yates is... If you'll bear with me just a moment. I'll have a moment, just a second. ...is that... This is citing the Stromberg rule, that a general verdict of conviction that may have rested on a non-constitutional error, which clearly reducing the proof needed for specific intent, which is clearly what the judge does differently because it doesn't require specific intent of the two things... Oh, you don't need a case to cite. You're right. I mean, if the court misinstructed the jury and lowered the... But if you have a dual-object conspiracy and you don't know which one they convicted on, the only remedy under Yates is to throw both out, which is what I'm saying, because clearly... And with the wire fraud, again, there is no... They had the opportunity to elicit this information from both Daniel and Shevchuk. Did you tell him? Did he know that it was to go transfer the bank? Ask them and bring these out from these witnesses. That was never done. And so I think what the mistake is here is everybody looks at it and goes, well, I think you can infer that, but you have to infer about six things to get that he knew anything about the essential objects. And to get around the willful blindness is why I brought up that neither of his co-defendants knew it, because clearly if they didn't know it, they couldn't convey that message to him. And if there's no evidence that Garrick imparted that knowledge to him, there's no way to prove that. I'll suggest you could find him guilty as sin if it was charged with fake identification. If you wanted to charge him with bank fraud, because there's a statement in there where Bedzanian says, I don't know that he knew, I have to assume that he knew, but he knew we were going to fill out papers at a bank. If you want to take that, you have enough for one prong, but you don't know which prong was convicted, so you'd have to throw it out under Yates. But again, it doesn't show that he was aware of wire fraud, which is the specific objects. Those are things I think that are very important, because that's the reason that... When did he drop the wire fraud? You mean to commit health care? Well, it's health care fraud and wire fraud. It was a dual-object conspiracy, and what I'm saying is even if you found nothing on the health care but found it was possible for the wire fraud, we don't know which one. And since both standards have been lowered regarding the proof of specific intent, they need to be thrown out, both of them, because we don't have a basis for it. And I'll suggest to you that the record doesn't show any of that. And when they talk about a cover story, he translated, and he stuck to the same story when he was picked up. I came to look at cars. Tadavosian was a livery driver. It's just... That's the basics. I mean, what they're trying to do, and he did it skillfully, was keep one side from knowing what the other did, and Garrett may have done that purposely, but you can't impart that knowledge and infer all those things that Sargis Tadavosian knew based on this record, and that's why we stuck with... There was insufficient evidence, because it also affected the findings in the jury instructions. Thank you.
judges: Paul V. Niemeyer, Allyson K. Duncan, Albert Diaz